IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | CR 112-177 |
| | ) | |
| LATERRIO DEANDRE COLLINS | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In the above-captioned criminal case, the government has charged Defendant Laterrio Deandre Collins with one count of possession with intent to distribute 28 grams or more of cocaine base and a quantity of cocaine hydrochloride, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(B); one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). (Doc. no. 1.) The matter is presently before the Court because Collins has filed a motion to suppress all evidence obtained as a result of the searches of his person and automobile, as well as the residence located at 3002 Clarkston Road in Augusta, Georgia, all of which occurred on March 1, 2012. (Doc. no. 22.) The government filed a response in opposition to this motion. (Doc. no. 28.) On July 26, 2012, an evidentiary hearing was held, during which the Court heard testimony from Investigators Alonzo Bell, Ty Hester, Jason Kennedy and Michael Dodaro

with the Richmond County Sheriff's Office.[1,2] For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** that Collins' motion to suppress be **DENIED**.

I. **FACTS**

In 2007, officers with the Richmond County Sheriff's Office, including Investigator Dodaro, began investigating a narcotics operation referred to by the government as the "Terry Tremaine Holliman Drug Trafficking Organization." (Doc. no. 28, p. 1; Def. Ex. 1, p. 3; FTR 3:10:22-11:02.[3]) In February of 2012, the officers' investigation, which included judicially authorized phone taps and multiple controlled buys, revealed that Holliman's cocaine supplier was an individual named Bryan Alexander Gibson. (FTR 3:11:02-12:10.) The officers intercepted phone calls in which Gibson indicated that he was going to buy cocaine from an unknown source on February 24, 2012. (FTR 3:12:58-13:24.)

---

[1] In addition, each party introduced a single evidentiary exhibit during the hearing; the government's exhibit consists of the search warrant for Collins' residence, and Collins' exhibit is a copy of Investigator Dodaro's incident report.

[2] As explained in this Court's Order dated August 22, 2012, at the end of the evidentiary hearing, retained defense counsel requested and was granted permission to file a supplemental brief upon receipt of the transcript of the July 26th proceedings. (See doc. no. 48.) However, when it came to the Court's attention that arrangements had not been made with the court reporter to obtain a transcript, the Court directed defense counsel to file a notice by August 24, 2012, that such arrangements had been made; the Court further explained that if no such notice was filed, the Court would make its recommendation on the motion to suppress based on the briefing already filed and on the information developed at the July 26th hearing. (Id. at 1-2.) No notice was filed by August 24th, and therefore this recommendation is based on the information in the record at the close of the July 26, 2012 evidentiary hearing.

[3] Citations to testimony from the evidentiary hearing refer to the Court's recording system, For the Record ("FTR").

Investigator Dodaro shared this information with other officers, including Investigator Bell, who followed Gibson on February 24th and observed him drive to the residence at 3002 Clarkston Road in Augusta, Georgia. (FTR 2:05:33-07:31; 3:13:24-13:41.) Gibson left the residence after being there for about an hour, briefly visited two gas stations, and immediately returned to the residence. (FTR 2:07:31-08:19.) Gibson again left the Clarkston Road residence after a short time, and Investigator Bell, along with several other officers, followed him to a Ramada Inn on Gordon Highway in Augusta. (FTR 2:08:19-08:33.) The officers observed Gibson meet with individuals later identified as Damien Sturgis and Dahho Glover in the Ramada Inn parking lot. (FTR 2:08:33-08:44.) Immediately following that encounter, several of the officers pulled over the vehicle occupied by Sturgis and Glover for a window tint violation, which resulted in the seizure of approximately 60 grams of cocaine and $2,000.00 in cash, as well as the arrests of Sturgis and Glover. (FTR 2:08:44-10:39.)

The investigating officers continued to conduct surveillance of Gibson following the February 24th incident, and on February 29, 2012, they again observed Gibson visit the Clarkston Road residence. Gibson arrived at the residence on the afternoon of February 29th and left after a few minutes. (FTR 3:12:58-13:50, 14:35-14:46; Gov't Ex. 1, p. 2.)

On March 1, 2012, a confidential informant told Investigator Dodaro that Gibson would be delivering cocaine to an individual named Freeman Cummings at the Country Hearth Inn on Gordon Highway in Augusta. (Gov't Ex. 1, p. 2.) Investigator Dodaro conveyed this information to Investigator Kennedy, who located Gibson's vehicle at the Clarkston Road residence at approximately 7:50 p.m. (Id.; FTR 2:36:00-37:29.) After about

3

30 minutes, Investigator Kennedy observed Gibson leave the residence and followed him to the Country Hearth Inn, where other officers were already posted. (FTR 2:37:29-38:27.) Investigator Kennedy and the other officers at the scene apprehended Gibson and found that he possessed approximately 87 grams of powder cocaine and 6 grams of crack cocaine. (Gov't Ex. 1, p. 2; FTR 2:38:27-39:35.)

Upon receiving the information concerning Gibson's arrest, Investigator Dodaro determined that he had an adequate basis to establish probable cause to search the Clarkston Road residence, and he began to prepare a search warrant application. (FTR 3:14:45-15:38.) Investigator Dodaro advised Investigator Kennedy and other officers to resume their surveillance of the Clarkston Road address. He further instructed that the officers should conduct an investigative stop of any vehicle observed leaving the residence until he could secure a search warrant. (FTR 3:15:38-15:52.)

Consistent with Investigator Dodaro's instructions, Investigator Kennedy returned to the Clarkston Road residence immediately after Gibson's arrest, arriving at approximately 9:00 p.m. (FTR 2:39:35-40:32.) At about 9:30 p.m., Investigator Kennedy and other officers at the residence, including Investigator Hester, observed a blue Dodge Charger exit the garage of the residence. (FTR 2:13:04-14:42, 40:32-41:08.) Because the officers were parked down the street from the residence, they could not tell who was driving the Dodge Charger or see how many people were in it as it pulled away from the residence. (FTR 2:18:21-19:19.) Investigators Kennedy and Hester, who were in separate cars, followed the vehicle, during which time they informed Investigator Dodaro of the situation. Investigator

4

Dodaro confirmed that they should conduct an investigative stop of the vehicle. (FTR 2:14:42-14:58, 41:08-41:44.)

Investigator Hester stopped the vehicle in a gas station parking lot, at which point he saw that Collins was the driver and sole occupant of the vehicle. (FTR 2:14:58-15:27.) Collins rolled his window down, and Investigator Hester asked Collins for his driver's license, which Collins provided.[4] (FTR 2:20:50-21:30.) Investigator Hester also asked Collins if there were any illegal drugs in the car, and Collins said that he had a Percocet pill in his pocket.[5] (FTR 2:15:27-15:49, 22:44-22:56.) Investigator Hester then asked Collins to step out of his car, and Collins complied with that request. (FTR 2:32:50-33:15.)

Around that time, Investigator Kennedy and several other officers arrived on the scene,[6] and Investigator Hester informed Investigator Kennedy that Collins had stated he had a Percocet pill.[7] (FTR 2:15:49-16:03, 41:50-42:20, 58:38-58:55.) Investigators Hester and

---

[4] Although Investigator Hester was not aware that Collins was in the vehicle when he initiated the traffic stop, he testified that he was familiar with Collins because several confidential informants had told him in the past that Collins was a cocaine supplier. (FTR 2:27:30-28:05.)

[5] Investigator Hester testified that Collins was still seated in the car when he asked Collins if there were any illegal drugs in the car and Collins stated he had a Percocet pill. (FTR 2:22:44-22:56.)

[6] Investigator Kennedy estimated that he arrived at the scene less than a minute after Investigator Hester pulled the vehicle over. (3:06:30-3:07:00.)

[7] Although Investigator Kennedy testified that Investigator Hester told him that Collins had admitted to possessing the Percocet pill upon his arrival at the scene, during cross examination, defense counsel brought forth that during a previous hearing in state court, Investigator Kennedy testified that *he* had asked Collins if there were any illegal drugs in the car during the pat-down search, at which point Collins stated he had the Percocet pill. (FTR 2:56:00-59:38.) Defense counsel also noted that Investigator Dodaro's incident report

5

Kennedy conducted a pat-down search of Collins' clothing, during the course of which Investigator Kennedy retrieved the Percocet pill from the front pocket of Collins' pants.[8] (FTR 2:16:03-16:16, 33:29-34:12, 42:20-42:59.) Collins did not indicate that he had a prescription for the pill, and the pill was loose in his pocket rather that in any type of container bearing a prescription label.[9] (FTR 2:16:16-16:28.) When the officers asked Collins where he got the pill, he stated that he got it from an unidentified individual. (FTR 2:29:10-29:34.) After confiscating the Percocet pill from Collins, Investigator Kennedy searched Collins' vehicle and found approximately 51 grams of crack cocaine and 29 grams of powder cocaine, as well as a firearm.[10] (FTR 2:16:28-16:50, 42:59-43:19; Def. Ex. 1, p.

---

states, "While patting [Collins] down for weapons, Inv. Kennedy and Inv. Hester asked [Collins] if he had any drugs or guns on him and [Collins] advised Inv. Kennedy and Inv. Hester that he had a Percocet pill in his pocket." (Def. Ex. 1, p. 4.) On re-direct examination, Investigator Kennedy noted that it is routine for him to ask a suspect a question that he or another officer already asked, such as whether the suspect has any illegal substances, to ensure the accuracy and consistency of any information provided by the suspect. (FTR 3:07:00-09:00.)

[8]Of note with regard to the pat-down search, Investigator Kennedy testified that, based on his experience as a narcotics officer, he considers any interaction with an individual involved in narcotics trafficking to present a safety risk because such persons often carry firearms. (FTR 2:45:14-45:44.)

[9]Investigator Hester noted during his testimony that Percocet is a prescription pain medication that is commonly involved in illegal narcotics transactions. (FTR 2:27:09-27:28.)

[10]Investigators Hester and Kennedy both testified that no one asked Collins for permission to search his vehicle and that Collins did not consent to the search of his vehicle. (FTR 2:26:15-26:22.) As defense counsel pointed out in the hearing, the incident report prepared by Investigator Dodaro states that "[Investigator] Kennedy asked Collins for permission to search [his car] which was granted." (Def. Ex. 1, p. 1.) Investigator Dodaro testified that this statement in the report was incorrect and resulted from a mistake he made

6

6.) The officers informed Investigator Dodaro what had occurred during the stop of Collins' vehicle so that the information could be included in the search warrant application. (FTR 2:44:20-45:13.)

Investigators Kennedy and Hester brought Collins back to the Clarkston Road residence after the traffic stop. (FTR 2:16:50-17:23, 43:19-43:53.) Shortly thereafter, the Honorable Daniel J. Craig, Richmond County Superior Court Judge, signed the search warrant authorizing a search of the Clarkston Road residence. (Gov't Ex. 1, p. 1.) Investigator Dodaro and other officers executed the warrant at approximately 11:00 p.m., which resulted in the discovery and seizure of approximately 25 grams of crack cocaine, 29 grams of powder cocaine, a marijuana cigar weighing about one ounce, and several items of drug paraphernalia.[11] (Id. at 4; Def. Ex. 1, pp. 4-6.)

---

in preparing the report; he further testified that Investigators Hester and Kennedy had told him they searched Collins' car based on his possession of the illegal Percocet pill and that neither of them ever indicated that Collins had consented to a search of his car. (FTR 3:34:10-35:33.) Notably, the incorrect statement that Collins consented to the search of his vehicle does not appear anywhere aside from Investigator Dodaro's initial incident report, including his later more detailed dictation documenting the incident or the affidavit he submitted in support his application for the warrant to search the Clarkston Road residence. (FTR 3:45:00-45:40; Gov't Ex. 1, pp. 1-4.)

[11]Although the officers did not know who, if anybody, lived at the Clarkston Road residence prior to March 1st, the searches of Collins' vehicle and the residence revealed photographs and documents indicating that Collins lived at the residence. (FTR 3:26:44-27:36.)

7

## II. DISCUSSION

### A. Credibility

During the hearing, defense counsel attempted to demonstrate certain inconsistencies in the government's testimonial and documentary evidence, which raises the threshold issue of credibility. In particular, defense counsel raised the issues of when Collins stated he possessed the Percocet pill and whether Collins consented to the search of his vehicle.[12]

Credibility determinations "are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder). In making its credibility determination, the Court must take into consideration not only the interests of the witness, but also "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." Ramirez-Chilel, 289 F.3d at 749, 750 (citations omitted).

Here, the Court credits Investigator Hester's testimony that he asked Collins whether he had any illegal drugs, to which Collins responded that he had a Percocet pill, while Collins was seated in the car, before Investigator Kennedy arrived on the scene. Investigator

---

[12]Neither of these factual issues is crucial to the resolution of the instant motion, since the government does not contend that Collins consented to the search, and, as explained below, the Court finds that the pat-down search of Collins' clothing and subsequent search of his vehicle were justified irrespective of whether he admitted to possessing Percocet before or during the pat-down search. See infra Part II.B. However, the credibility determinations serve to clarify the sequence of events at issue and to address the purported inconsistencies that Collins has attempted to establish.

Hester was unequivocal in testifying that the initial exchange in which Collins admitted possession of the Percocet pill occurred at that time, and he plausibly explained that the exchange occurred as the result of his standard procedure of asking vehicle occupants if they possess anything illegal during the initial portion of a stop. (FTR 2:15:27-15:49, 22:44-22:56.) Moreover, the fact that Investigator Kennedy may have later asked Collins the same question during the pat-down search is not inconsistent with Investigator Hester having asked the question previously, especially given Investigator Kennedy's credible testimony that it is routine for him and other officers to repeat questions to suspects to ensure the accuracy and consistency of any information provided. (FTR 3:07:00-09:00.)

The Court also credits the testimony of Investigators Hester, Kennedy, and Dodaro that there was never any indication that Collins consented to the search of his vehicle. Although Investigator Dodaro's initial incident report states that Collins consented to the search, Investigator Dodaro candidly testified that such statement resulted from a mistake on his part in writing the report.[13] (FTR 3:34:10-35:33.)

### B. Stop and Search of Collins' Vehicle

Collins argues that officers lacked justification to conduct the traffic stop that led to the subsequent searches of his clothing and car. Collins emphasizes that the officers did not know who was driving his vehicle at the time they initiated the traffic stop, and he contends

---

[13] Of note, inconsistencies in an incident report are not necessarily fatal to an officer's credibility with respect to his testimony regarding the events summarized in the report. Cf. United States v. Smith, ___ F.3d ___, 2012 WL 2989105, at *1 n.10 (11th Cir. 2012) (noting that the omission of details in incident report does not render an officers' testimony unreliable).

that the officers' observation of him driving away from the Clarkston Road residence was insufficient to give rise to reasonable suspicion of involvement in illegal activity. Collins asserts that, because the initial traffic stop was impermissible, all evidence seized during the traffic stop should be suppressed. (See doc. no. 22-1, pp. 3-7; FTR 3:49:00-51:54.) The government contends that Collins' departure from a residence known to be used for drug trafficking provided an adequate justification for the initial stop and that the subsequent searches of Collins' clothing and care were likewise justified. (Doc. no. 28, pp. 3-7; FTR 3:51:59-55:02.)

For the reasons set forth below, the government has the better argument.

### 1. The Initial Stop Was Supported by Reasonable Suspicion of Criminal Activity

Where a party moves for the suppression of evidence, the movant bears the initial burden of showing that he was subjected to a search or seizure and that the evidence in question should be suppressed; in the context of a warrantless search or seizure, the burden then shifts to the government to show that the encounter was consensual or that the search or seizure was justified. See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977)[14]; United States v. Beckham, 505 F.2d 1316, 1318 (5th Cir. 1975).

"A traffic stop . . . is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion . . . ." United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008). The reasonableness of an investigative stop,

---

[14]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

including a traffic stop, turns on two inquiries: (1) whether the stop was reasonable at its inception, and (2) whether the stop became unreasonable in its scope or duration. See United States v. Acosta, 363 F.3d 1141, 1144-45 (11th Cir. 2004); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). Under Terry v. Ohio, 392 U.S. 1, 30 (1968), the police may briefly stop and detain persons in order to investigate a reasonable suspicion that those persons are involved in criminal activity, even in the absence of probable cause to believe that a crime has been committed. United States v. Lewis, 674 F.3d 1298, 1303 (11th Cir. 2012); United States v. Williams, 619 F.3d 1269, 1271 (11th Cir. 2010) ("[T]he law does not require absolute certainty or even probable cause before an officer stops a car; he need only reasonably suspect that its occupants are involved in criminal activity."). Reasonable suspicion is determined from the totality of the circumstances, United States v. Sokolow, 490 U.S. 1, 8 (1989), and requires that the officer point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the investigative stop. Terry, 392 U.S. at 21; see also United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999).

Although the "reasonable suspicion" required for a Terry stop is less stringent than the requirement for probable cause, United States v. Mikell, 102 F.3d 470, 475 (11th Cir. 1996), "reasonable suspicion" requires does require "more than just a hunch." Lewis, 674 F.3d at 1303 (quoting United States v. Lee, 68 F.3d 1267, 1271 (11th Cir. 1995)). The officer must be able to articulate some minimal, objective justification for the investigatory detention. Acosta, 363 F.3d at 1145; United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989). Moreover, reasonable suspicion for a stop can be based on the "collective"

knowledge of all the officers involved in the stop, Acosta, 363 F.3d at 1145, and officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

Here, the government has shown reasonable suspicion of criminal activity at the time of the traffic stop at issue based on the collective knowledge of the officers involved, including Investigators Dodaro, Hester, Kennedy, and Bell. After learning from intercepted phone calls that Gibson, a known cocaine dealer, was going to purchase cocaine on February 24, 2012, officers followed him to the Clarkston Street residence that day. (FTR 2:05:33-07:31; 3:13:24-13:41.) Officers, including Investigator Bell, observed Gibson participating in a drug transaction after leaving the Clarkston Road residence that day. (FTR 2:08:19-10:39.) Less than a week later, a confidential informant told Investigator Dodaro that Gibson would be making a cocaine delivery on March 1st. On that day, Investigator Kennedy and other officers observed Gibson stop by the Clarkston Road residence immediately before he was apprehended with cocaine at the location the informant told the officers the drug transaction was to take place. (Gov't Ex. 1, p. 2; FTR 2:36:00-39:35.) Based on this information, the officers who made the traffic stop had ample reason to believe that the Clarkston Road residence was used as a place to conduct drug transactions. As the government argues (see doc. no. 28, p. 5), an individual's recent presence at a residence where drug trafficking occurs is a prominent factor in support of reasonable suspicion to believe that the person is involved in criminal activity. See United States v. Powell, 222 F.3d

913, 917 (11th Cir. 2000) (finding officers had reasonable suspicion for traffic stop, based in part on the fact the stop occurred after the suspect made a brief visit to the residence of a known drug dealer).

Furthermore, the chronology of the events leading up to the traffic stop weighs significantly in favor of finding that officers reasonably suspected criminal activity. Based on their observations during the February 24th incident, the officers reasonably believed that Gibson obtained his cocaine at the Clarkston Road residence. On March 1st, they observed Gibson visit the residence just before he was apprehended with cocaine on the way to make a sale, and they then observed the blue Dodge Charger leaving the residence roughly an hour later. (FTR 2:13:04-14:42, 36:00-37:29, 40:32-41:08.) Therefore, the officers knew that whoever was in the Dodge Charger had been at the residence during Gibson's visit. They also knew that the purpose of Gibson's visit was likely to purchase cocaine, which strongly suggests that the person in the Dodge Charger had just been involved in a drug transaction at the Clarkston Road residence when he left the residence and Investigator Hester pulled him over.

The Court is unpersuaded by Collins' contention that the officers lacked reasonable suspicion because they were not aware of his identity at the commencement of the traffic stop. Certainly, given that multiple confidential informants had previously told Investigator Hester that Collins was a cocaine dealer, the officers would have had even more reason to suspect his involvement in illegal activity had they identified him prior to the stop or had they known he lived at the Clarkston Road residence. However, that does not show that the information available to the officers was inadequate to establish the requisite level of

13

suspicion. Indeed, officers frequently observe facts that lead them to reasonably suspect an individual's involvement in criminal activity without knowing the individual's identity. See, e.g., Williams, 619 F.3d at 1271 (finding officers reasonably suspected unknown vehicle occupants' involvement in criminal activity based on the fact that the vehicle was seen driving away from a high-crime area shortly after a gunshot); see also Lewis, 674 F.3d at 1304 (finding officers' reasonably suspected criminal activity when one of a group of unknown individuals stated he was carrying a handgun).

Therefore, given the totality of the circumstances – particularly Collins' recent presence at the Clarkston Road residence when a drug transaction likely occurred – the Court concludes that the government has shown that the officers involved in the March 1st stop reasonably suspected criminal activity such that the stop provides no basis for the suppression of evidence sought in the instant motion.

### 2. The Officers Had Reasonable Suspicion to Conduct a Pat-Down Search During the Traffic Stop

The government has also shown that the officers did not violate Collins' constitutional rights by conducting a pat-down search during the traffic stop.

During a valid investigatory detention, officers may conduct a pat-down search of a suspect's clothing if there is reason to believe that the safety of the officers or others is at risk. Terry, 392 U.S. at 27; United States v. White, 593 F.3d 1199, 1202 (11th Cir. 2010) ("In connection with a Terry stop, an officer may conduct a pat-down search if he has reason to believe that his own safety or the safety of others is at risk."). "The issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety

14

or that of others was in danger." United States v. Hunter, 291 F.3d 1302, 1306 (11th Cir. 2002) (quoting Terry, 329 U.S. at 27).

Here, by the time the officers conducted the pat-down search of Collins' clothing, they reasonably suspected that he had just been involved in a drug transaction, as explained above. See supra Part II.B.1. Also, Investigator Hester ascertained Collins' identity prior to the pat-down search, and he testified that multiple confidential informants had previously told him that Collins was a cocaine dealer. (FTR 2:27:30-28:05.) Moreover, Investigator Kennedy testified that, based on his experience as a narcotics officer, an interaction with an individual involved in narcotics trafficking presents a safety risk because such persons often carry firearms. (FTR 2:45:14-45:44.)

Based on this information alone, the officers reasonably believed that Collins may have been armed and posed a safety risk such that the pat-down search was warranted. See Lewis, 74 F.3d at 1309 ("Law enforcement officers are at greatest risk when dealing with potentially armed individuals because they are the first to confront this perilous and unpredictable situation." (quoting United States v. Gibson, 64 F.3d 617, 624 (11th Cir. 1995)); United States v. Packer, 375 F. App'x 976, 980 (11th Cir. 2010) (*per curiam*) (concluding pat-down search was justified by factors that included the suspect's likely recent involvement in a drug transaction and the officer's conclusion that his safety was at risk because "based on his experience, people who trafficked in drugs also carried weapons"); United States v. Bentley, 151 F. App'x 824, 830 (11th Cir. 2005) (*per curiam*) (finding suspect's known involvement in drug transactions contributed to officers' reasonable belief that he posed a safety threat such that pat-down search was warranted). Collins' admitted

possession of the Percocet pill prior to the pat-down search further contributed to the officers' reasonable belief that he posed a safety threat justifying a pat-down search of his clothing. See United States v. Knight, 562 F.3d 1314, 1327 (11th Cir. 2009) (concluding that smelling marijuana and alcohol during traffic stop contributed to officer's reasonable belief that suspect posed safety threat, which justified pat-down search).

In sum, the government has provided facts demonstrating that Officers Hester and Kennedy had a reasonable belief that Collins may have been armed and posed a threat to their safety. Therefore, the pat-down search of Collins' clothing during the traffic stop provides no basis for suppressing any evidence.

### 3. The Search of Collins' Vehicle Was Supported by Probable Cause

The search of Collins' vehicle likewise provides no basis for suppression. In general, the police may search an automobile without a warrant under three circumstances: (1) incident to the lawful arrest of an occupant of the vehicle "if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest," Arizona v. Gant, 556 U.S. 332, 351 (2009);[15] (2) based upon probable cause if the vehicle is readily mobile, see Pennsylvania v. Labron, 518 U.S. 938, 940-41 (1996) (*per curiam*); or, (3) with valid consent, see Ohio v. Robinette, 519 U.S. 33, 39-40 (1996).

---

[15]Of course, it should also be noted that once officers have conducted a lawful arrest of the occupant-owner of the vehicle, they may also lawfully impound the car and conduct an inventory search. See Arkansas v. Collins, 532 U.S. 769, 770 (2001) (*per curiam*); Colorado v. Bertine, 479 U.S. 367, 368-69 (1987) (upholding inventory search of van after driver's arrest for drunk driving).

In this instance, there was no warrant to search Collins' vehicle, and Collins did not consent to the search. See supra Parts I & II.A. However, when asked if he had anything illegal during the initial portion of the stop, Collins admitted that he possessed a Percocet pill, which the officers knew to be a controlled substance that is illegal to possess without a prescription. (FTR 2:15:27-15:49, 22:44-22:56, 27:09-27:28.) The officers then retrieved the Percocet pill during their pat-down search of Collins' clothing, and when they asked Collins where he got the pill, he stated vaguely that he got it from someone else, with no indication that he possessed it pursuant to a valid prescription. (FTR 2:16:03-16:28, 33:29-34:12, 42:20-42:59.) Moreover, as explained above, the officers had information that Collins was a known cocaine dealer, and they had followed him directly from a residence in which a drug transaction had likely just occurred. See supra Part II.B.1. Based on the totality of this information, the officers reasonably suspected that there was contraband in Collins' readily mobile vehicle,[16] which is all that is required to justify their search of the vehicle. See Labron, 518 U.S. at 940 ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more."); see also United States v. Edwards, 307 F. App'x 340, 344 (11th Cir. 2009) (*per curiam*) (finding that officer's observation of vehicle occupant in possession of narcotics provided probable cause to search vehicle).

In sum, the Court concludes that the government has shown the necessary justification for the initial stop, the pat-down search of Collins' clothing, and the subsequent

---

[16]There is no dispute that the vehicle was readily mobile.

search of Collins' vehicle. The Court therefore finds no basis to suppress any evidence because of these events.

### C. The Stop and Search of Collins' Vehicle Did Not Lead to an Improper Search of the Clarkston Road Residence

Collins' only argument regarding the search of the Clarkston Road residence is that it constitutes fruit of the poisonous tree in that it resulted from an improper stop and search of his vehicle. (See doc. no. 22-1, pp. 3, 7.) This argument necessarily fails given the Court's previous determination that the government has demonstrated that the stop and search of Collins' vehicle were justified. See supra Part II.B.

## III. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that Collins' motion to suppress be **DENIED**. (Doc. no. 22.)

SO REPORTED and RECOMMENDED on this 30th day of August, 2012, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE